UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LUIS ANGEL PEREZ,

Plaintiff,

v.

THE NEW YORK AND PRESBYTERIAN
HOSPITAL,

Defendant.

05 Civ. 5749 (LBS)

**MEMORANDUM**
**& ORDER**

SAND, J.:

      Luis Angel Perez ("Plaintiff") brings this action against The New York and

Presbyterian Hospital ("Defendant" or "the Hospital") seeking money damages for the

Hospital's alleged violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000(e), *et seq.* ("Title VII"). Plaintiff alleges that the Hospital discriminated against him

based on his race and national origin, created a hostile work environment, and retaliated

against him for complaining of Title VII violations. Presently before this Court is the

Hospital's motion for summary judgment. Because We find that there are no genuine

issues of material fact, We grant the Hospital's motion for summary judgment on all

claims.

## I.    Background

      Plaintiff is a bilingual English/Spanish-speaking Hispanic male of Puerto Rican

descent, and holds a bachelor's degree in psychology from the City University of New

York, which he earned in 1996. (Pls. Dep. 1, 41.)[1] The Hospital hired Plaintiff on July

---

[1] Plaintiff was deposed over two days, and the transcripts are separately paginated. "Pls. Dep. 1" refers to
the October 15, 2008 deposition, while "Pls. Dep. 2" refers to the November 5, 2008 deposition.

29, 2002 as a mental health worker ("MHW") assigned to the inpatient psychiatric unit at the Hospital's Allen Pavilion campus ("Psychiatric Unit").[2]  (Compl. ¶¶ 5, 9; Minsky Aff. ¶ 9.)  Plaintiff's responsibilities included observing patients and reporting changes or problems to supervisors or nurses; escorting patients to other areas of the Allen Pavilion; washing and dressing patients; performing patient room searches; "identify[ing] unit and/or patient care problems and participat[ing] in problem solving approaches;" "participat[ing] in developing the milieu as part of the inter-disciplinary team;" and helping to "structure [patient] leisure time," *inter alia*.  Though the parties dispute some details of the job description, they agree that the job responsibilities did not include delivering psychotherapy.  (Minsky Aff. Ex. E; Pls. Mem. Opp. Mot. Summ. J. ("Pl's. Br.") Ex. E.)  MHWs are required to implement the tasks assigned by nursing staff in the Psychiatric Unit.  (Minsky Aff. ¶¶ 10-11; Pl's Br. Ex. E.)

The patients in the Psychiatric Unit are approximately 50% bilingual English/Spanish-speaking Hispanics and 30% monolingual Spanish-speaking Hispanics. (Pl's. Br. Ex. A 2.)  The physician in charge of psychiatric care, Lourdes Dominguez, M.D., and the Assistant Chief, Giovanni Nunez, M.D., are of Hispanic national origin. (Minsky Aff. ¶ 8.)  Being a bilingual English/Spanish-speaker is a job hiring preference for MHWs.  (Minsky Aff. Ex. E; Pl's. Br. Ex. E.)

Hospital policy, as set by medical staff at the Psychiatric Unit, requires all communications in the vicinity of patients to be in English unless otherwise directed. The Hospital's proffered rationale for this policy is to avoid "splitting"—a situation in which "a patient hears two different languages and refuses to cooperate with English

---

[2] Plaintiff's wife also has worked for the Hospital as a clerk in a different department since approximately 2003.  (Pl's. Dep. 1, 15-17.)  Plaintiff is unaware of any unlawful discrimination or retaliation directed towards her there.  (Pl's. Dep. 1, 15-17.)  They have three children.  (Pl's. Dep. 1, 15-17.)

speaking nurses and doctors[,] thereby undermining treatment." (Minsky Aff. ¶ 8.) The Hospital maintains that it "does not have an English-only policy." (Minsky Aff. ¶ 8.) Plaintiff was frequently required to translate for and speak to Spanish-speaking patients with limited or no proficiency in English. (Pl's. Aff., Nov. 29, 2005, Pl's. Dep. Ex. 7, at 3.)

Plaintiff alleges that he was "thrust into a hostile work environment" and "relentlessly reprimanded for speaking Spanish to co-workers and patients."[3] (Compl. ¶ 24.) He alleges that his nursing supervisors "frequently used ethnic slurs and engaged in conduct denigrating [him] because of his national origin," including mocking patients with limited English proficiency, mocking the Spanish language, demeaning him for speaking Spanish to patients, and referring to Hispanic individuals as "those people." (Compl. ¶ 25; Pl's. Dep. 1, 211, 204-06, 81, 183, 186.) Plaintiff also alleges that the overheard several statements made by supervisors encouraging black employees not to fraternize with Hispanic employees or patients. (Compl. ¶ 27-28.)

On January 11, 2003, an altercation occurred between a patient and Psychiatric Unit staff that left some staff members hospitalized; Plaintiff was not at the Hospital at the time. (First Am. Compl. Ex. B.) When Plaintiff learned what had transpired, he was angry that he was not informed of the incident, and he wrote a letter to Dr. Nunez. (First Am. Compl. Ex. B.) The letter suggested various changes to staff training and the way crisis incidents are handled and investigated. (First Am. Compl. Ex. B.) On January 22, 2003, Plaintiff was disciplined by nurse manager Darlene Galashaw for conducting an "investigation" into the incident by interviewing patients and staff and sending the results

---

[3] Plaintiff also alleges that he witnessed many other employees being reprimanded for speaking Spanish. (First Am. Compl. 7.)

in a letter to Dr. Nunez.  (McGuire Aff. Ex. D.)  The Nurse Manager explained the "unit and department" investigation procedures, and counseled Plaintiff not to interfere with official investigations and to remain within the boundaries of his job description.[4] (McGuire Aff. Ex. D.)

Although Plaintiff never utilized the hospital's anti-harassment grievance program, (Minsky Aff. ¶ 7), Plaintiff alleges that he complained about the Hospital's discriminatory treatment of Hispanic patients and employees on several occasions. (Compl. ¶ 30).  In June 2003, Plaintiff circulated an eight-page memorandum to Hospital administrators lodging various complaints about Hospital policies.  (Compl ¶ 32; Pl's. Br. Ex. M.)  The June 2003 memorandum protested that the "majority of nursing staff" was "simply unprofessional," and complained of nurses' negative attitudes and actions towards patients and MHWs, *inter alia*.  (Pl's. Br. Ex. M.)  Although Plaintiff mentions several incidents involving monolingual Spanish-speaking patients, the memorandum complains of neither racial slurs nor reprimands for speaking Spanish.  (Pl's. Br. Ex. M.)  Plaintiff alleges that he was admonished for filing this report in a meeting with Hospital administrators, who seemed more concerned by the fact that he had circulated the memorandum to so many people than by the substance of his allegations.  (Compl. ¶ 33; First Am. Compl. 1.)

On August 15, 2003, Dr. Nunez came upon a crisis situation in which a number of Hospital employees were attempting to medicate a hostile patient.  When Dr. Nunez entered the room, she observed Plaintiff speaking Spanish to the patient while a nurse simultaneously spoke English to the patient.  (Pl's. Dep. 2, 241.)  Dr. Nunez counseled

---

[4] Plaintiff claims that this instance of discipline and the documentary record of it were fabricated by the Hospital.  (Pl's. Br. 16.)

Plaintiff not to speak Spanish to a patient unless instructed to do so by a physician. (Compl. Ex. C 1.)  Plaintiff wrote a letter to Dr. Nunez the same day explaining that he was speaking Spanish in an attempt to convince the bilingual patient to drink his medication voluntarily rather than be restrained and receive an injection.  (Compl. Ex. C 2.)  In the letter, Plaintiff stated that he "disagree[d] with [the 'anti-splitting'] argument" as explained to him that day by Dr. Nunez and two nurses because he believed it was more effective to communicate in the patient's native language in a crisis situation. (Compl. Ex. C 2.)  Plaintiff stated that he always directed the patients to obey the English speaking staff when he spoke to them in Spanish.  (Compl. Ex. C 2.)

On August 26, 2003, Plaintiff received a "final written warning" from nurse manager Dorrette Johnson[5] for the August 15, 2003 incident, playing a videotape for patients that Plaintiff allegedly brought from his house on August 17,[6] and refusing to take his break when assigned on August 21.[7]  (Compl. ¶ 35, Ex. B 2, Ex. D.)  The final written warning charged that Plaintiff had failed to follow directions and protocols and had engaged in "disruptive behavior related to patient care."  (Compl. Ex. B 1.)  The warning ordered Plaintiff to work within the scope of his job title in the future, "never to usurp or take over the care of a patient from a nurse or a physician," "accept your assignment including dinner breaks," and "work under the direction of the R.N." (Compl. Ex. B 1-2.)  The warning then threatened Plaintiff with termination if he ever worked outside the scope of his job responsibilities in the future.  (Compl. Ex. B 1-2.)

---

[5] Plaintiff claims that although Ms. Johnson signed the document, it was the work product of Maryellen Hickman.  (Pl's. Dep. 2, 234.)
[6] Plaintiff claims that this allegation was false.  (Compl. Ex. D 4.)
[7] Plaintiff claims that due to a security situation involving a patient, he could not take his break until security arrived an hour and a half after the break was scheduled.  (Compl. Ex. D 1-3.)

Plaintiff alleges that there had been no prior written warnings or reprimands issued to him.  (Compl. ¶ 37.)

On approximately August 30, 2003, Plaintiff responded to the final written warning with a letter addressed to three nursing supervisors and a human resources employee.  (Compl. ¶ 39.)  In the letter, he explained his actions and claimed that some of the allegations were false.  (Compl. Ex. D 5.)  He stated that he believed he was targeted because of his June 2003 memorandum, and that he disagreed with the classification of the warning as a "final written warning" rather than a "reprimand."  (Compl. Ex. D 5.) Though he requested to "appeal" the final written warning, Plaintiff claims that this request and the complaints outlined in his June 2003 memorandum were ignored by Hospital staff.  (Compl. ¶ 40.)

On November 1, 2003, Plaintiff wrote a letter to nursing supervisors and the Human Resources department regarding his disagreement with the policy of assigning male MHWs to escort female psychiatric patients to receive x-rays and conduct Maximum Observations (which entail supervision of patients at all times, including while dressing, washing, and using the bathroom).  (First Am. Compl. Ex. F 3.)  Plaintiff believed that these unsupervised, one-on-one assignments subjected male MHWs to an unreasonable risk of false accusations of sexual misconduct.  (First Am. Compl. Ex. F.) In the letter, Plaintiff stated that both nurse manager Doris Burch and Dr. Nunez had reaffirmed to him that all male MHWs were required to do these assignments, but Plaintiff alleged that other male MHWs were uncomfortable with the policy and afraid to speak out.[8]  (First Am. Compl. Ex. F 2.)

---

[8] Plaintiff never received a response.  (First Am. Compl. 6.)

All claims based on specific events discussed up to this point in the Background section are time-barred by the 300 day statute of limitations for Title VII claims, as are all claims that pre-date November 4, 2004.[9]   However, these events may be taken into consideration as background context for timely Title VII claims.  *Uddin v. City of New York*, No. 07 Civ. 1356 (PAC) (DF), 2009 WL 2496270, at *13 (S.D.N.Y. Aug. 13, 2009) (*citing Early v. Wyeth Pharms.*, 603 F. Supp. 2d 566, 572 (S.D.N.Y. 2009); *Nat'l RR Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002)).

About half a year later, in May 2004, Plaintiff circulated another memorandum entitled "The Underserved" to various Hospital administrative staff addressing the problems created by the fact that most of the patients at the Psychiatric Unit were Spanish-speakers, yet the majority of MHWs did not speak Spanish.  (Compl. Ex. E.)  The six-page memorandum began by noting that the conditions complained of in his June 2003 memorandum were "moving, slowly but surely, in the right direction."  (Compl. Ex. E. 2.)  It then requested various changes to more effectively serve Spanish-speaking patients, including hiring more Spanish-speaking staff, requiring all current MHWs to learn Spanish, and increasing Spanish language recreational materials for patients. (Compl. Ex. E.)  The memorandum then requested a "significant makeover" of the MHW job description to include more one-on-one time with patients, less time cleaning, and more assignments of Spanish-speaking MHWs to monolingual Spanish-speaking patients.  (Compl. Ex. E.)  The memorandum ended by acknowledging the rationale behind the limited Spanish-speaking policy (avoiding a "split" between Spanish and English speakers) and disagreeing with it.  (Compl. Ex. E.)

---

[9] *See infra* Part III.A.

On May 17, 2004, Plaintiff was reprimanded by nurse manager Doris Burch for speaking Spanish to a patient, and a formal problem report was written.  (Pl's. Aff., Nov. 29, 2005, Pl's. Dep. Ex. 7, at 3.)  Plaintiff claims he was called in to discuss the problem report with nurse manager Henny Kaufman on May 19, 2004; she read aloud the problem report which included "talking to a Spanish speaking patient" and "translating for the doctor."  (Pl's. Aff., Nov. 29, 2005, Pl's. Dep. Ex. 7, at 3.)  Plaintiff claims that Ms. Kaufman said the complaints "seemed petty and ridiculous," but refused to give Plaintiff a copy of the problem report and told him to "do what ever they tell" him and to keep the conversation between Plaintiff and herself.  (EEOC Charge, McGuire Aff. Ex. J 3.)

Plaintiff requested May 20, 2004 off for his birthday fifteen days in advance, and also made "several follow up calls." (Pl's. Aff., Nov. 29, 2005, Pl's. Dep. Ex. 7, at 3.) The night before his birthday, the Hospital refused the request because no other MHWs could cover the shift, but Plaintiff took the day off anyway.[10]  He was disciplined and not paid for the day.  (Pl's. Dep. 1, 52-53.)

On May 24, 2004, Plaintiff was given a "last final written warning" for failing to work within the scope of his job responsibilities and sending out the May 2004 report. (McGuire Aff. F; Pl's. Dep. Ex. 15.)  He was also given a memorandum that stated that "the department is interested in any suggestions any of the staff may have[,] . . . however, this should not be through the format of a written report. . . . Once again you have sent out what you have labeled a 'six page report' regarding your concerns . . . .  [Y]ou were informed that . . . you were to address [concerns] with the appropriate staff.  You

---

[10] Plaintiff claims that after the request was denied, he left a message with nurse manager Henny Kaufman informing her that he would nonetheless be taking the day off for a "mental health day." (First Am. Compl. Ex. H 8.)  Plaintiff also claims that two other requests for time off were denied around this time.  (First Am. Compl. Ex. H 8.)

continue to ignore this directive." (Pl's. Dep. Ex. 15.) The memorandum also alleged that Plaintiff was "walking around the unit with a journal where [he appeared] to be recording information about patients . . . ." (Pl's. Dep. Ex. 15.) The memorandum instructed Plaintiff to "follow [his assignments] without deviation," "not to counsel patients or sit with them [one-on-one] unless you have been directed to," "not to deliver psychotherapy," and to "address [any problems you may notice] directly to your supervisor or the assigned appropriate staff," *inter alia*. (Pl's. Dep. Ex. 15.) The memorandum ended by threatening him with termination for any further violations. (Pl's. Dep. Ex. 15.)

Plaintiff was also taken into a disciplinary meeting on May 24, 2004 in the Human Resources office with Dr. Dominguez and the Director of Human Resources. Plaintiff claims that Dr. Dominguez instructed him to refuse to translate for "Doctors, Nurses, or anyone that asks the Plaintiff for help," and told him that "eventually she will put something in writing for the rest of the Spanish-speaking staff to also refuse to translate." (Pl's. Aff., Nov. 29, 2005, Pl's. Dep. Ex. 7, at 3.) Plaintiff was reprimanded again for speaking Spanish by a nurse on June 19, 2004. (EEOC Charge, McGuire Aff. J.)

On July 8, 2004, Plaintiff was suspended for three days for refusing to escort female patients to receive x-rays alone. (McGuire Aff. G.) Though Plaintiff had repeatedly objected to this assignment, (Pl's. Dep. 1, 242-45), he maintains that this

accusation (made by Ms. Burch) was false because he was not in fact assigned to escort the patient in question.[11]  (First Am. Compl. 7.)

Soon afterwards, Plaintiff requested time off due to "distress," but was ignored. (Pl's. Aff., Nov. 29, 2005, Pl's. Dep. Ex. 7.)  On August 9, 2004, he became ill with vertigo and took time off work for his illness; he did not return to work until August 28, 2004.  (Pl's. Aff., Nov. 29, 2005, Pl's. Dep. Ex. 7.)  Plaintiff had previously requested most of these dates off for vacation, but the request had been denied.[12]  On September 1, 2004, Plaintiff was "banished" from work until he could obtain medical clearance to resume work; he resumed work on September 3, 2004.[13]  (Pl's. Aff., Nov. 29, 2005, Pl's. Dep. Ex. 7; First Am. Compl. 8.)

On August 30, 2004, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC").  Plaintiff checked the boxes for race discrimination and retaliation on his EEOC charge.  (EEOC Charge, McGuire Aff. J.)   In the charge, Plaintiff described several incidents: the August 15, 2003 reprimand and written warning for speaking Spanish to a patient; the May 17, 2004 reprimand and "last final written warning" for speaking Spanish to a monolingual Spanish-speaking patient; the June 19, 2004 reprimand for "speak[ing] Spanish in the hospital;" and the July 8, 2004 three-day suspension for being "falsely accused" of refusing to escort female psychiatric patients to receive x-rays.  (EEOC Charge, McGuire Aff. J.)  The charge also alleged that "the

---

[11] In response to the suspension, Plaintiff sent a letter to Union organizers, (Pl's. Aff., Nov. 29, 2005, Pl's. Dep. Ex. 7.), and mailed a letter to Hospital CEO Herbert Pardes stating that he felt like there was "an award offered to whoever manages to get [him] fired first."  (First Am. Compl. Ex. I.)

[12] There is a discrepancy between Plaintiff's two accounts of the vacation time request; in the first account, he claims that the request was denied, while in the other, he claims that it was granted.  (July 9, 2004 Mem. to Union, First Am. Compl. Ex. H 8; Pl's. Aff., Nov. 29, 2005, Pl's. Dep. Ex. 7, at 4.)

[13] Plaintiff claims that he was required to get this clearance twice, and that his request to use his two personal days to obtain the medical clearance documents was denied.  (Pl's. Aff., Nov. 29, 2005, Pl's. Dep. Ex. 7, at 4; First Am. Compl. 8.)

majority of non-Spanish speaking employees in this hospital, including administrators, incessantly oppress Spanish-speaking patients and staff," that this treatment was "inhuman and abusive," and that he and his family suffered "physically, psychologically, emotionally, and spiritually."  (EEOC Charge, McGuire Aff. J 2-3.)  After investigating the matter, the EEOC dismissed the charge on January 24, 2005 because it was unable to conclude that the Hospital had violated the law.  (Compl. Ex. A.)

On November 17, 2005, Plaintiff alleges that he overheard the Unit Secretary and the Unit Chief Assistant of Psychiatry refer to him as a "whistleblower" then "silently watch[ him] walk by."  (First Am. Compl. 8.)  On November 29, 2005, Plaintiff claims a nurse told his colleagues that Plaintiff might "plant things [in a patient's room] just to make us look bad."  (First Am. Compl. 9.)

Plaintiff was scheduled to work on February 22, 23, and 24, 2005.  (Minsky Aff. ¶ 9.)  On the morning of February 22, allegedly over five hours before the start of his shift, he requested those days off because his children were out of school that week, his babysitter canceled, and he was unable to find other child care arrangements.[14]  (Pl's. Aff., Nov. 29, 2005, Pl's. Dep. Ex. 7, at 7; First Am. Compl. 9.)  He left a single telephone message with nurse manager Janet Collins and spoke to a woman in the main office, and informed them that he needed the three days off.  At "approximately 11:16 am," Plaintiff received a voicemail and telegram from the Ms. Collins threatening him with termination if he didn't report to work.  (First Am. Compl. Ex. K 1.)  Plaintiff did not contact Ms. Collins or anyone else in the nursing or human resources departments after receiving the communications from Ms. Collins.  (Pl's. Dep. 1, 21-24, 27.)  Though

---

[14] Plaintiff also claims he was unfairly reprimanded for taking three days off in January and February, despite the fact that the absences had been approved earlier.  (Pl's. Aff., Nov. 29, 2005, Pl's. Dep. Ex. 7, at 8.)

he reported to work on February 26, 2005 (he was not scheduled to work on February 25, 2005), he was met at the door and told he'd been fired, and sent home.  (Pl's. Dep. 1, 37, 248.)  On March 3, 2005, Plaintiff was sent a letter terminating his employment for "job abandonment."  (McGuire Aff. Ex. I.)

  On June 22, 2005, Plaintiff filed a *pro se* complaint in the Southern District of New York, raising various claims against the Hospital, including claims under Title VII.[15]  On October 6, 2005, Plaintiff amended his complaint to add 1199 SEIU New York's Health & Human Service Union ("Union") as a defendant.  We granted the Union's motion for summary judgment on all claims in an order dated March 20, 2006.  Marshall Benjamin Bellovin of Ballon, Stoll, Bader, and Nadler, P.C. appeared as counsel for Plaintiff on June 7, 2007, and Plaintiff filed a Third Amended Complaint ("Complaint") on October 12, 2007.  In the Complaint, Plaintiff raises four claims against the Hospital under Title VII: (1) discrimination based upon race, (2) discrimination based upon national origin, (3) hostile work environment, and (4) retaliation for complaining of Title VII violations.  Because the Complaint is not clear regarding precisely which factual allegations form the basis for which claims, the Court deems the Complaint to raise all four claims with regard to all facts alleged.  (*See* Compl. ¶¶ 75-87.)

  On March 5, 2007, we granted an order on consent relieving Ballon, Stoll, Bader, and Nadler, P.C. as Plaintiff's counsel, and Plaintiff resumed proceeding *pro se* in this matter.  The Hospital made the instant motion for summary judgment on all claims pursuant to Rule 56 of the Federal Rules of Civil Procedure on July 7, 2009.

---

[15] The case was originally before Judge Mukasey.  The Complaint named Herbert Pardes, the Hospital's CEO, as the Defendant.  Plaintiff then amended his Complaint to substitute the Hospital as the Defendant on August 8, 2005.  The case was then transferred to Judge Lynch on September 9, 2005.  Judge Lynch recused himself on January 11, 2006, and the case was transferred to this Court.

## II.      Standard of Review

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that might affect the outcome of a suit under governing law.  *Kinsella v. Rumsfeld,* 320 F.3d 309, 311 (2d Cir. 2003).  A "genuine" issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of showing that no genuine issue of material fact exists, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir. 1986), and a court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. Am. Piles, Inc.,* 138 F.3d 81, 87 (2d Cir. 1998) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  A moving defendant can meet this burden by "setting forth specific facts denying [plaintiff's] claims." *Jermosen v. Coughlin*, 877 F. Supp. 864 (S.D.N.Y. 1995) (*citing Williams*, 781 F.2d at 323).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted).

Once the moving party has met its initial burden, the burden switches to the non-moving party to offer admissible evidence showing that he can support his claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). "The non-moving party may not rely on conclusory allegations or unsubstantiated speculation," *Scott v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998) (citation omitted), but must present "significant probative evidence tending to support the complaint." *Smith v. Menifee,* 00 Civ. 2521 (DC), 2002 WL 461514, at *3 (S.D.N.Y. Mar. 25, 2002) (*citing First Nat'l Bank of Ariz. v. Cities Servs. Co.,* 391 U.S. 253, 290 (1968)); *see also* Fed. R. Civ. P. 56(e). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

Additionally, in discrimination cases, "[a] trial court must be cautious about granting summary judgment to an employer when . . . its intent is at issue . . . [b]ecause writings directly supporting a claim of intentional discrimination are rarely, if ever, found." *Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir. 1994) (internal citations omitted). Yet, summary judgment remains available "even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir. 2001), when the evidence only "gives rise to mere speculation and conjecture" rather than a "reasonable inference of discrimination." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 448 (2d Cir. 1999).

When summary judgment is sought against a party proceeding *pro se*, the court must interpret that party's papers "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks and citation omitted). "Even a *pro se* plaintiff, however, cannot defeat a motion for summary

14

judgment by relying merely on the allegations of a complaint," and must "come forward with evidence in admissible form." *Uddin v. City of New York,* No. 07 Civ. 1356 (PAC) (DF), 2009 WL 2496270, at *10-11 (S.D.N.Y. Aug. 13, 2009) (*citing Champion v. Artuz,* 76 F.3d 483, 485 (2d Cir. 1996)); *see also Jermosen v. Coughlin,* 877 F. Supp. 864, 867 (S.D.N.Y. 1999) (*Pro se* plaintiffs must still present concrete evidence from which a reasonable jury could return a verdict in their favor in order to defeat summary judgment.).

Under Local Rule 56.1, the moving party must submit "a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a).  If the opposing party fails to controvert the moving party's Rule 56.1 statement by submitting it's own 56.1 statement, then the material facts contained in the moving party's statement are generally deemed admitted. *See* Local Civ. R. 56.1(c).  While *pro se* litigants are also bound by Rule 56.1, *Vt. Teddy Bear Co., Inc. v. 1-800-BEARGRAM Co.,* 373 F.3d 241, 246 (2d Cir. 2004), the court retains discretion to examine the record should a *pro se* litigant fail to submit a Rule 56.1 statement, *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir. 2001), and must do so to verify that the "moving party's assertions are supported by the record." *Uddin*, 2009 WL 2496270, at *10-11 (*citing Vt. Teddy Bear Co., Inc.,* 373 F.3d at 244; *Holtz,* 258 F.3d at 74).

In the instant motion, Defendant submitted a Rule 56.1 statement, but Plaintiff submitted only a memorandum of law and attached exhibits.  As such, the Court has examined the evidentiary submissions in Plaintiff's and Defendant's prior filings with the

Court, as well as Plaintiff's deposition transcripts and the numerous exhibits attached thereto.

## III.   Discussion

### a.   Jurisdiction and Statute of Limitations Issues

The Court notes at the outset that all claims raised by Plaintiff based on events that pre-date November 4, 2003 are time barred, as his EEOC charge was filed on August 30, 2004.[16]   "Where numerous separate and discrete discriminatory acts are alleged, only those acts occurring within the statutory period are actionable.  A court may, however, consider the prior acts as background evidence to support a timely claim."  *Uddin*, 2009 WL 2496270, at *13 (*citing Early v. Wyeth Pharms.,* 603 F. Supp. 2d 566, 572 (S.D.N.Y. 2009); *Nat'l RR Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002)).

As regards exhaustion of administrative remedies, Defendants argue that the Court lacks jurisdiction over Plaintiff's claims because Plaintiff did not raise such claims in his administrative charge with the EEOC.  This Court has jurisdiction over Title VII claims only if they have already been raised before the EEOC or if they are "reasonably related to those that were filed with the agency." *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003) (*quoting Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 686 (2d Cir. 2001)).  Conduct is "reasonably related" to an EEOC charge if "[1] the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; [2] [the plaintiff] alleges retaliation for filing the EEOC charge; or [3]

---

[16] Plaintiff filed the EEOC charge on August 30, 2004, so all events prior to November 4, 2003 are time barred as outside the 300 day limitations period.  42 U.S.C. § 2000e-5 requires that a Charge of Discrimination "be filed with the EEOC within 300 days of the occurrence of the discriminatory act for which recovery is sought." *Uddin*, 2009 WL 2496270, at *13 (*citing Harris v. City of New York,* 186 F.3d 243, 247 n.2 (2d Cir. 1999) (300-day rule applies in New York State)).  Because Plaintiff has not exhausted his hostile work environment claim, claims based on those acts falling outside of the statute of limitations period are time barred.  *Nat'l RR Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

the plaintiff 'alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.'" *Id.* (*quoting Butts v. City of N.Y. Dep't of Hous. Preservation and Dev.,* 990 F.2d 1397, 1402-03 (2d Cir. 1993)).  The "reasonably related" exception to the exhaustion requirement "'is essentially an allowance of loose pleading' and is based on the recognition that 'EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [he] is suffering.'" *Deravin*, 335 F.3d at 201 (*quoting Butts,* 990 F.2d at 1402).

   The Hospital argues that Plaintiff's national origin discrimination claims were not appropriately presented to the EEOC because he did not check the box on his charge indicating that he was complaining of national origin discrimination, and his charge did not mention that he is Puerto Rican.  But in the threshold exhaustion inquiry, "it is the substance of the charge and not its label that controls."  *Alonzo v. Chase Manhattan Bank, N.A.,* 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998).  The EEOC defines national origin discrimination "broadly" to include discrimination based on the "linguistic characteristics of a national origin group."  *Deravin*, 335 F.3d at 201 (*quoting* 29 C.F.R. § 1606.1).  The facts alleged in Plaintiff's charge all speak to various instances of "non-Spanish speaking employees [and] administrators . . . oppress[ing] Spanish-speaking patients and staff." (McGuire Aff. Ex. J 2.)  Although Plaintiff did not mention he was Puerto Rican in his administrative charge, the facts alleged would have prompted the EEOC to include national origin discrimination within the reasonably expected scope of its investigation. *Butts,* 990 F.2d at 1402.  Indeed, when the EEOC notified the Hospital of Plaintiff's

charge of discrimination by letter dated September 7, 2004, the EEOC checked the "national origin" box rather than the "race" box.  (Pl's. Dep. Ex. 10.)

The Hospital next argues that Plaintiff failed to exhaust his racial discrimination claim because he did not explicitly allege racial discrimination in his charge, nor did he identify his race.  However, Plaintiff did check the box on the face of his charge indicating that he was complaining of racial discrimination, and his charge complains of discrimination against Spanish-speaking hospital staff.  (McGuire Aff. Ex. J 2.)  "[R]ace and national origin discrimination may present identical factual issues when a victim is 'born in a nation whose primary stock is one's own ethnic group[,]' . . . [and thus] in certain circumstances . . . national origin and race discrimination may overlap." *Deravin*, 335 F.3d at 201 (citations omitted).  Because "race and national origin discrimination claims may substantially overlap or even be indistinguishable," *id.*, checking the box for discrimination based on race, combined with alleging facts regarding national origin discrimination based on "linguistic characteristics," 29 C.F.R. § 1606.1, sufficed to alert the EEOC to the need to investigate allegations of racial discrimination.  *See also Deravin*, 335 F.3d at 202 (noting that courts have had difficulty separating the concepts of national origin and race discrimination in the case of Hispanic plaintiffs, and that in certain cases, "the line between [the two forms of discrimination] may be so thin as to be indiscernible.") (citation omitted).

The Hospital claims that Plaintiff also failed to exhaust his discrimination and retaliation claims regarding the termination of his employment, which occurred after the EEOC investigation had concluded.  The second "reasonably related" exception for allegations of retaliation for the filing of the EEOC charge itself applies only when the

plaintiff shows a "specific linkage between filing [her] EEOC charge and . . . [the] act of

retaliation." *Id.* (*quoting Alfano,* 294 F.3d at 382).[17]  Where a complaint merely

"generally allege[s] 'retaliatory conduct" on the part of [the employer]," as is the case

here, "the pleading [fails to allege a specific] link between that conduct and the filing of

her EEOC charge." *Alfano,* 294 F.3d at 382.  Furthermore, Plaintiff has offered no

evidence showing a "specific linkage" between his EEOC charge and his termination;[18]

to the contrary, Plaintiff admitted he was on notice that his decision not to report for work

for three days would cause his termination.[19]  (Pl's. Dep. 1, 35-36.)  As regards the third

"reasonably related" exception for "further incidents of discrimination carried out in

precisely the same manner" as alleged in the EEOC charge, Plaintiff only alleged a

suspension for a false report that he refused to escort a female psychiatric patient to

receive x-rays.  *Butts,* 990 F.2d at 1402.  Thus, his suspension for failing to show up to

work for three consecutive days could not be categorized as occurring in "precisely the

same manner" as any discrimination or retaliation alleged in the complaint.  *Id.*  As such,

the claims regarding Plaintiff's termination were not properly exhausted.

---

[17] The first "reasonably related" exhaustion exception, which looks to the reasonably expected scope of an EEOC investigation, "does not apply to conduct that occurs after the EEOC completes its investigation," and so does not apply to Plaintiff's post-investigation termination.  *Santos v. Engelhard Corp.*, No. 05 Civ. 203(PGG), 2009 WL 2432736, at *6 n.7 (S.D.N.Y. Aug. 6, 2009) (*citing Fields v. Merrill Lynch, Pierce, Fenner & Smith*, No. 03 Civ. 8362 (SHS), 2004 WL 626180, at *3 (S.D.N.Y. Mar. 30, 2004); *Carter v. New York*, 310 F. Supp. 2d 468, 474 (N.D.N.Y. 2004)).

[18] Although Plaintiff does claim he overheard supervisors refer to him as a "whistle blower" on November 17, 2004, the Complaint alleges no connection between this statement, made nearly two months after his EEOC charge was filed, and his termination.  Nor has Plaintiff provided any allegations or evidence that any such statement referred to the EEOC charge rather than the multiple "reports" Plaintiff circulated.

[19] Nor does nearly six month gap between the filing of the charge and Plaintiff's termination, standing by itself, permit an inference of retaliation for the purposes of showing a "specific linkage" under the second *Butts* factor.  *Butts,* 990 F.2d at 1402 (The Court of Appeals for the Second Circuit has "relaxed the exhaustion requirement based on the close connection of the retaliatory act to both the initial discriminatory conduct and the filing of the charge itself."); *see also Gentile v. Potter,* 509 F. Supp. 2d 221, 239 & n.9 (E.D.N.Y. 2007) (four months is too long ); *Nicastro,* 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) (three months is too long).

Plaintiff similarly failed to exhaust his claims that he was given more assignments to transport female psychiatric patients individually in violation of Title VII, thus exposing him to greater risk of fabricated sexual harassment claims. This allegation was completely absent from his EEOC charge. (EEOC charge, McGuire Aff. Ex. J.) The charge alleged only that he was suspended based on a "false" report that he had refused to escort a patient, and did not mention that he had been disproportionately assigned to this kind of task, or that he had in fact objected to these assignments. (EEOC charge, McGuire Aff. Ex. J.) Such an allegation is not "reasonably related" to the allegations in the administrative charge because the EEOC would not be sufficiently notified of Plaintiff's claims of discriminatory or retaliatory escort assignments so as to include them in their investigation.[20] *Butts,* 990 F.2d at 1402.

Plaintiff also failed to exhaust his hostile work environment claim. "To present a hostile work environment claim to the EEOC, a plaintiff must have alleged facts sufficient to suggest 'a pervasive, abusive environment upon which a rational trier of fact could find that he was subjected to a hostile work environment due to his [membership in a protected class].'" *Wright v. N.Y.C. Off-Track Betting Corp.,* No. 05 Civ. 9790 (WHP), 2008 WL 762196, at *3 (S.D.N.Y. Mar. 24, 2008) (*quoting Bazile v. N.Y.C.,* 215 F. Supp. 2d 354, 361 (S.D.N.Y. 2002)). However, Plaintiff's "EEOC Charge contains little or no information with respect to the factors that courts have traditionally examined in assessing whether conduct is sufficiently hostile or abusive to support a Title VII claim." *Hooda v. Brookhaven Nat. Laboratory*, No. 08 Civ. 3403 (JS) (WDW), 2009 WL 2984184, at *5 (E.D.N.Y. Sept. 15, 2009). These include "the frequency of the

---

[20] Nor do the other two "reasonably related exceptions" apply with regard to this allegation. *Butts,* 990 F.2d at 1402.

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Leibovitz v. New York City Transit Auth.,* 252 F.3d 179, 188 (2d Cir. 2001) (*citing Harris v. Forklift Sys.,* 510 U.S. 17, 21 (1993)).

Plaintiff's EEOC charge merely alleges that "the majority of the non-Spanish speaking employees in this hospital, including administrators, incessantly oppress Spanish-speaking patients and staff," that this is "inhuman and abusive," and that he and his family suffered "physically, psychologically, emotionally, and spiritually."  (McGuire Aff. J 2-3.)  Other than these conclusory assertions, the Charge only mentions several discrete instances of discipline, and is devoid of any reference to racist jokes or pervasive and frequent treatment causing humiliation and rising above the level of mere offense. *Id.*  Rather, the allegations in the EEOC charge relate solely to several discrete instances of alleged discrimination or retaliation, which are insufficient to exhaust a hostile work environment claim. *Wright*, 2008 WL 762196, at *3 ("Generally, presenting a disparate treatment or retaliation claim to the EEOC will not exhaust a hostile work environment claim.")

As such, Plaintiff only properly exhausted (i.e., preserved for review) his racial and national origin discrimination claims and retaliation claims based on discipline for (1) speaking Spanish to patients, (2) speaking Spanish to co-workers, (3) agitating for a change in the Hospital's language policies, and (4) allegedly refusing to escort a female

patient on July 8, 2004. All other claims are unexhausted and/or time-barred, and will not be considered by the Court.[21]

### b. Discrimination Based on Race and National Origin

Title VII prohibits employers from discriminating against "any individual . . . because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1). Title VII claims such as this one are analyzed under the *McDonnell Douglas* three-step burden shifting analysis.[22]  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973).

Under *McDonnell Douglas*, the plaintiff must first establish a *prima facie* case of discrimination or retaliation. To establish a *prima facie* case of discrimination, the plaintiff must show that: (1) he was a member of the protected class; (2) he was qualified for the job in question; (3) the employer took an adverse employment action against him; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981); *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir. 2000). The burden of proof to survive summary judgment in establishing a *prima facie* case is "*de minimis*." *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 94 (2d Cir. 2001).

Once the plaintiff makes this *prima facie* showing, a presumption of discrimination arises, and the burden shifts to the employer to articulate a "legitimate, non-discriminatory or non-retaliatory reason for the adverse action taken against the

---

[21] The Court has considered all other claims and facts not discussed in this analysis, and concluded that they are unexhausted and/or time-barred. This includes all new claims raised by Plaintiff in his memorandum opposing the instant motion.

[22] The Complaint casts Plaintiff's Title VII claims as "mixed motive" claims, but the mixed motive framework only applies when the plaintiff has offered direct evidence of discrimination, which is not the case here. *See Smith v. Tuckahoe Union Free School Dist.*, No. 03 Civ. 7951 (PGG), 2009 WL 3170302, at *5 (S.D.N.Y. Sept. 30, 2009) (citation omitted).

plaintiff." *Uddin*, 2009 WL 2496270, at *15 (*citing Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142-43 (2000)); *see also Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir. 2000). At this stage, the employer is only required to rebut the plaintiff's *prima facie* case by establishing "through the introduction of admissible evidence, the reasons for the [adverse action against the plaintiff]." *Burdine,* 450 U.S. at 254-55.

Once the employer articulates a non-discriminatory reason for the adverse action, the presumption of discrimination drops out and the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's proffered reason was a pretext for discrimination or retaliation. *Reeves,* 530 U.S. at 143. At this stage, the employer is entitled to summary judgment "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination [or retaliation]." *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir. 2000). To do so, the plaintiff must show not only that the proffered reason was false, but also that discrimination or retaliation was "the real reason," *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993), "through direct, statistical or circumstantial evidence." *Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1225 (2d Cir. 1994). Throughout the litigation, the plaintiff retains the ultimate burden of proving that the employer intentionally discriminated or retailed against him. *Burdine,* 450 U.S. at 253.

In the instant case, the Hospital does not dispute that Plaintiff was a member of a protected class and qualified for his job. The Hospital does dispute that the disciplinary warnings and memoranda Plaintiff received could be characterized as "adverse employment actions."  To constitute an adverse employment action for Title VII purposes, an action must be a "materially adverse change in the terms and conditions of

employment." *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000). It must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Weeks v. New York State,* 273 F.3d 76, 85 (2d Cir. 2001).  Examples of "materially adverse" actions include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.* (*quoting Galabya,* 202 F.3d at 640).  However, there are "no bright-line rules in applying this standard," so courts must closely examine the facts of each case.  *Knight v. City of New York*, 303 F. Supp. 2d 485, 496 (S.D.N.Y. 2004) (*citing Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir. 1997)).

"[W]ritten and oral criticisms[,] . . . even if unjustified, are not adverse employment actions."  *Meder v. City of New York*, No. 05 CV 919 (JG), 2007 WL 1231626, at *4 (E.D.N.Y. Apr. 27, 2007).  Nor does "writing a reprimand for violating company policy . . . itself constitute an adverse employment action." *Scott v. City of New York Dept. of Correction*, No. 04 Civ. 9638 (SHS), 2009 WL 1683350, at *15 (S.D.N.Y. Jun. 17, 2009); *see also Cody v. County of Nassau,* 577 F. Supp. 2d 623, 645 (E.D.N.Y. 2008) ("falsely accusing plaintiff of being absent without authorization," "threatening plaintiff with future counseling notices and disciplinary actions," "writing plaintiff up for leaving work early," and similar actions were not adverse employment actions). "[D]isciplinary memoranda and evaluations are adverse employment actions only if they affect ultimate employment decisions such as promotions, wages or termination." *Regis v. Metro. Jewish Geriatric Ctr.,* 97 Civ. 0906, 2000 WL 264336, at *8 (S.D.N.Y. Jan. 11, 2000).

As such, the May 2004 reprimand for circulating the May 2004 report, *inter alia*, is not an adverse employment action because it did not even purport to rise to the level of a "alteration of job responsibilities;" it merely counseled Plaintiff to work within the confines of his job description and to bring all complaints and suggestions to his immediate supervisor rather than Hospital administration.[23]  Nor has Plaintiff demonstrated that this reprimand "affect[ed] ultimate employment decisions."  *Regis*, 2000 WL 264336 at *8.  Plaintiff was aware that his decision not to report for work for three days would cause his termination, and has not shown that another factor caused his termination.  (*See* Pl's. Dep. 1, 35-36.)

Assuming arguendo that Plaintiff could make out a *prima facie* case on the remaining discrimination claims,[24] Plaintiff has not offered sufficient evidence to show a genuine issue of material fact as to whether the Hospital's proffered reasons for its actions were pretextual.

First, as to the three-day suspension, the Hospital claims that Plaintiff was disciplined for refusing to escort a female patient, but Plaintiff claims that he was not assigned to escort a female patient that day.  Plaintiff has admitted that he repeatedly objected to the female patient escort assignments.  (*See, e.g.*, First Am. Compl. Ex. F 3; Pl's. Dep. 1, 230.)  On July 1, 2004, in an email to the nurse managers, Doris Burch claimed that Plaintiff told her that day, "I do not take ANY FEMALE patient to x-ray," and that he had told her this ten to twenty times over the past year.  (Pl's. Br. Ex. R 1.)

---

[23] However, the adverse employment act test is somewhat different under a Title VII retaliation theory.  *See infra* Part III.C.
[24] Though an EEOC guideline provides that an English-only policy, "blithely enforced at all times" can allow plaintiffs to establish a *prima facie* case of discrimination, courts are split as to whether to defer to this guideline.  *See Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 613 n.6 (S.D.N.Y. 2009) (discussing 29 C.F.R. § 1606.7(a)).  Like the *Pacheco* Court, we "need not enter the fray to decide the instant motion."  *Id.*

The letter indicates that Plaintiff was not assigned to the female patient on July 1, 2004, but he stated that "[i]t does not matter, I do not take females!" (Pl's. Br. Ex. R 2.) Six days later, Plaintiff was issued a corrective action form for "[c]ontinued unsatisfactory job performance (failure to follow directions . . . in the care of the patient)," which ordered him to "accept and complete assignments as delegated." (McGuire Aff. G.) Plaintiff claims he was told verbally that the write-up was based on a refusal to escort a female patient on July 1, 2004. (Pl's. Dep. 2, 187.)

It is ambiguous based on these facts whether Plaintiff was being disciplined for the repeated verbal objections to these assignments[25] or for an actual refusal on July 1, 2004, which likely did not occur based on Ms. Burch's email. But regardless, Plaintiff has not offered sufficient evidence to raise a genuine issue of material fact as to whether the real reason for the suspension was Plaintiff's race and/or national origin. Rather, the evidence indicates that even if he did not refuse to escort a patient on July 1, 2004, the suspension was more likely than not based on his repeated objections to these assignments, even if he did complete them under protest. (*See, e.g.*, McGuire Aff. G; Pl's. Dep. 2, 187.) Indeed, Plaintiff's November 2003 letter to Hospital administration states that the other male MHWs did not object to the policy because they were "afraid to speak out," indicating that Plaintiff's continued objections are likely what singled him out for discipline in this instance, rather than his race or national origin. (*See* First Am. Compl. Ex. F 2.)

---

[25] Ms. Burch claimed that these verbal objections took the form of a standing, flat refusal to complete the assignment, (Pl's Br. Ex. R 2), and Plaintiff claims that they took the form of accepting the assignments and stating his "uncomfortability with it." (Pl's. Dep. 1, 68-69.) Plaintiff claims he objected "repeatedly." (Pl's. Dep. 1, 230.)

Second, as regards non-work related conversations in Spanish, the Hospital claims that it does not have a blanket English-only policy.  While courts have been more leery of blanket English-only policies that encompass even non-work related conversations, *see Pacheco*, 593 F.Supp.2d at 613 (collecting cases), Plaintiff has not put forward sufficient evidence to conclude that he was in fact reprimanded for non-work related Spanish conversations.  Plaintiff claims that Ana Larios, a clerk, will testify that she was scolded for "speaking Spanish in the office, away from the patients," and that Mr. Williams, a security guard, was "screamed at a couple of times for speaking Spanish on the unit." (Pl's. Dep. 2, 41-42, 214-15.)  Plaintiff also claims that he was scolded for having a conversation in Spanish with security guard Julio Merejo sometime during September 2004.  (Pl's. Dep. 1, 94; Pl's. Dep. 2, 209-13.)  But Plaintiff has not provided affidavits from any of the aforementioned individuals.  Given that Plaintiff has put forward nothing more than his own allegations, and given that so many other instances of discipline admittedly occurred during this time period for speaking Spanish to patients, Plaintiff has not put forwards sufficient evidence to raise a genuine issue of material fact as to whether he was disciplined for non-work related Spanish conversation.

Third, as regards the Hospital's "anti-splitting" policy, Plaintiff has not put forward sufficient evidence to show that the Hospital's proffered reason was false and that discrimination motivated the enforcement of the policy.[26]  The Hospital's policy prohibits Spanish conversations in the vicinity of patients because the medical staff has determined it is in the patients' best interest.  (Def's. 56.1 Stat. ¶10; Minsky Aff. ¶ 8.) The rationale is based on avoiding "splitting," where patients refuse to obey English-

---

[26] While claims that an English-only policy violates Title VII are typically analyzed based under a disparate impact theory, Plaintiff's Complaint (which was drafted by his then-counsel) does not allege a disparate impact claim.  (*See* Compl ¶¶ 75-82 (referencing employer's motive).)

speaking staff after being spoken to in Spanish.  (56.1 ¶10; Minsky Aff. ¶ 8.)  However, Plaintiff was frequently asked to translate by Hospital medical staff, (Pls. Br. Ex. A), and being English/Spanish bilingual was a MHW hiring preference.  (Pls. Br. Ex. E; Minsky Aff. Ex. E.)

While a "speak-English instruction may form the basis for an inference of national origin discrimination" if supported by other evidence, *Roman v. Cornell Univ.,* 53 F. Supp. 2d 223, 236 (N.D.N.Y. 1999), courts have upheld limited English-only policies against Title VII challenges when supported by valid business justification.  *See*, *e.g. Roman,* 53 F. Supp. 2d at 237 (goal of promoting employee cohesion was a valid business justification for limited English-only policy); *EEOC v. Sephora USA, LLC,* 419 F. Supp. 2d 408, 417 (S.D.N.Y. 2005) (holding that English-only policy of retailer was justified as a means of improving communication with customers and noting that "promoting politeness to customers" is a valid business justification for limited English-only policy).  In fact, the Hospital has recently been granted summary judgment on claims that its limited English-only policy in another department constituted disparate treatment in violation of Title VII.  *Pacheco,* 593 F. Supp. 2d 599 (finding that the Hospital's policy was supported by valid business justification).

Additionally, courts have been especially leery of finding a limited English-only policy's proffered justification to be a pretext when applied to a bilingual employee such as Plaintiff who is capable of communicating while not violating the policy.  *See Pacheco*, 593 F. Supp. 2d at 613 (collecting cases).  Furthermore, courts have found that the fact that an employee has been asked or required to speak Spanish on the job undercuts any inference of discrimination when evaluating a limited English-only policy.

*Id.* (*citing Long,* 894 F. Supp. at 942).  Here, Plaintiff quite frequently was asked to speak Spanish with monolingual Spanish-speaking patients.[27]  (Pls. Br. Ex. A.)

Circumstantial evidence of discriminatory intent is lacking.  Plaintiff's evidence of racial slurs and jokes is based solely on his own allegations and has not been substantiated by a third party's affidavit; nor do his allegations even indicate that jokes and slurs were common occurrences.  Neither the "reports" plaintiff submitted to Hospital administrators nor his EEOC charge even mentioned slurs or jokes.  (*E.g.*, Pl's. Br. Ex. M; Compl. Ex. E; McGuire Aff. Ex. J.)  There is also no record that Plaintiff ever utilized the Hospital's internal grievance process to complain of slurs and jokes.  (Minsky Aff. ¶ 7.)  While Plaintiff has amply demonstrated his disagreement with the Hospital's limited English-only policy, which was set by the senior medical staff in the Psychiatric Unit, he has not put forth sufficient evidence to show that the Hospital's proffered rationale was false and that the policy was motivated by discrimination, given the record before the Court.

Accordingly, the Court grants summary judgment to Defendants on all disparate treatment claims based on race and national origin.[28]

### c.  Retaliation

Retaliation claims are also analyzed under the *McDonnell Douglas* burden-shifting framework. *See Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1038-39 (2d

---

[27] The Hospital has been less than clear regarding exactly when Plaintiff was and wasn't allowed to speak Spanish on the job; it remains unclear based on all the evidentiary submissions whether Plaintiff was not allowed to speak Spanish to any patient unless first directed to, or was only prohibited from speaking Spanish to a patient when that patient was being spoken to in English as well. (*See* Minsky Aff. ¶ 8; Pls. Br. Ex. A; Def's. 56.1 Stat. ¶ 10.)  But this apparent ambiguity is most likely due to the absence of affidavits from the doctors and nurses who created and enforced the policy, and does not affect the outcome of this claim because Plaintiff has failed to show discriminatory intent, *inter alia*.

[28] The Court has determined that any exhausted events not discussed in this analysis were too minimal to constitute an "adverse employment action," and thus summary judgment is appropriate on all disparate treatment claims.

Cir. 1993).  First, a plaintiff must establish a *prima facie* retaliation claim by showing that: "(1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir. 1996).

Plaintiff has established the first two elements of the *prima facie* case as regards his May 24, 2004 discipline.  "To prove that he engaged in protected activity, the plaintiff need not establish that the conduct he opposed was in fact a violation of Title VII. However, the plaintiff must demonstrate a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir. 1988) (internal citations and quotation marks omitted).  As regards the Spanish-related complaints, there is ample evidence that Plaintiff complained about his working conditions in good faith and that the Hospital was plainly aware of these complaints; he was explicitly disciplined for sending out the May 2004 report.  (McGuire Aff. F; Pl's. Dep. Ex. 15.)  However, all complaints based on patient care do not qualify as protected activity for purposes of retaliation because Title VII does not apply to third parties who are not in an employment relationship a defendant.  *See Taneus v. Brookhaven Memorial Hosp. Medical Center*, 99 F. Supp. 2d 262, 267 (E.D.N.Y. 2000) (*citing Wimmer v. Suffolk County Police Dep't.*, 176 F.3d 125, 135 (2d Cir.1999), *cert. denied,* 528 U.S. 964 (1999)).

As for whether Plaintiff suffered an adverse employment action, "the anti-retaliation provision [of Title VII], unlike the substantive provision, is not limited to

discriminatory actions that affect the terms and conditions of employment." *White,* 548 U.S. at 64.  "The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67.  Thus, the "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal citations and quotation marks omitted).

While the May 24, 2004 discipline was partly given in response to Plaintiff's May 2004 report, thus meeting the causal link requirement, this action was not sufficiently material to constitute an adverse employment action for the purposes of retaliation analysis.  First, the Court of Appeals for the Second Circuit has noted that "criticism of an employee [alone] . . . is not an adverse employment action," for retaliation or disparate treatment purposes.  *Weeks,* 273 F.3d at 86.  Second, the disciplinary memorandum asked Plaintiff to redirect his job-related complaints to a different recipient, not to stop making these complaints entirely.  Plaintiff has not offered sufficient evidence for a reasonable juror to conclude that this memorandum would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *White,* 548 U.S. at 64.  Though the inquiry is objective, the fact that Plaintiff later sent a letter complaining of discrimination to the Hospital's CEO in July 2004 provides further reason to doubt that an order to redirect criticism is sufficiently material to prevent future complaints and constitute an adverse employment action.  (Compl. Ex. E 1.)  The May 17, 2004, reprimand for speaking Spanish to a patient, even assuming it could meet the other elements of a *prima facie* case, is for the same reason insufficiently material to constitute

an adverse employment action.  And as in the disparate treatment context, Plaintiff has

not demonstrated that these reprimands, rather than his decision not to report to work for

three days, caused his termination.[29]  (*See* Pl's. Dep. 1, 35-36.)

There is also insufficient evidence to conclude that Plaintiff's complaints

regarding his escort assignments with female patients were based on a "good faith,

reasonable belief that the underlying challenged actions of the employer violated the

law."  *Manoharan*, 842 F.2d at 593 (internal citations and quotation marks omitted)).

Plaintiff apparently did not complain to Hospital administration that such assignments

were discriminatory based on race or national origin.  His November 2003 letter is devoid

of such an allegation.  (First Am. Compl. Ex. F 3.)  Rather, he believed it was wrong to

assign any male, regardless of race or national origin, to these escort assignments.  While

sex discrimination is prohibited by Title VII, there is no indication that Plaintiff believed

that such assignments constituted discrimination based on sex in violation of Title VII or

complained to Hospital staff on that basis.  Even though he believed the assignments

were wrong in a practical or moral sense, Plaintiff's complaints were not based on a good

faith, reasonable belief that such assignments violated the law.[30]  While Plaintiff

eventually made the unexhausted claim that he was disproportionately given these

assignments in violation of Title VII based on race and national origin, this allegation

---

[29] As to the possibility that his July 8, 2004 suspension for refusing to escort was in fact imposed in retaliation for the May 2004 report, even if a *prima facie* case could be made out based on the temporal proximity, Plaintiff has not submitted sufficient evidence to show that the Hospital's proffered reason for the suspension, refusal to escort, is false and that retaliation for the May 2004 report was the real reason.
[30] This is supported by the fact that Plaintiff's four federal complaints, drafted by both himself and his then-counsel, lack an allegation of discrimination based on sex.

was apparently not raised with the Hospital before he filed his federal complaints, so it could not have constituted protected activity of which the Hospital was aware.[31]

## IV. Conclusion

Based on the foregoing, we grant the Hospital's motion for summary judgment on all claims.


So ordered.

Dated:  _Nov. 3_, 2009
       New York, NY

U.S.D.J.

---

[31] The Court has determined that all other retaliation claims based on exhausted events not discussed in this analysis fail to present a *prima facie* case or rebut the Hospital's proffered justifications; thus, summary judgment is appropriate on all retaliation claims.